**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| VALERIE M. OCASIO,             ) | |
|             ) | |
|      Plaintiff,         ) | |
|             ) | Judge Joan B. Gottschall |
|      v.           ) | |
|             ) | Case No. 12 CV 1690 |
| MICHAEL J. ASTRUE[1],       ) | |
| Commissioner of Social Security,   ) | |
|             ) | |
|      Defendant.      ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Valerie M. Ocasio ("Ocasio") brings this action pursuant to 42 U.S.C. § 405(g),

seeking review of a final decision of the Commissioner of Social Security ("Commissioner")

denying her claim for disability insurance benefits. Ocasio asks the court to reverse the

Commissioner's decision and remand the case to the Social Security Administration ("SSA").

The government filed a cross-motion for summary judgment based on the same arguments it

raised in its response to Ocasio's motion for summary judgment. For the reasons stated below,

Ocasio's motion [18] is granted and the government's motion [24] is denied.

### I. PROCEDURAL HISTORY

On May 5, 2009, Ocasio filed a claim for disability insurance benefits under Title II

of the Social Security Act. She alleged a disability onset date of January 22, 2009. On October 7,

2009, the SSA denied Ocasio's claim. On January 14, 2010, the claim was denied again upon

reconsideration. A hearing was held before Administrative Law Judge Lovert Bassett ("ALJ") on

October 1, 2010. The ALJ denied Ocasio's benefits on November 22, 2010, and on January 10,

---

[1] Carolyn W. Colvin, Acting Commissioner of Social Security is substituted as the defendant.
*See* Fed. R. Civ. P. 25(d).

2012, the SSA Appeals Counsel denied Ocasio's request for review of the ALJ's decision, rendering the Commissioner's decision final.

After exhausting her administrative remedies, Ocasio filed a complaint in federal court. In support of her motion for summary judgment, Ocasio raises three arguments: (1) the ALJ failed to weigh properly the medical opinions of her treating physicians and the medical expert ("ME") who testified at her hearing before the ALJ, (2) the ALJ failed to evaluate Ocasio's credibility properly, and (3) the ALJ relied upon flawed vocational expert ("VE") testimony that did not take all of her medical conditions into consideration. The government filed a cross-motion for summary judgment, arguing that the court should affirm the Commissioner's decision because it was supported by substantial evidence.

## II. FACTUAL BACKGROUND[2]

### A. Ocasio's Medical Treatment History

In 1989, Ocasio sustained a fractured cervical vertebrae and right pelvis as a result of a car accident. (R. 587.) The medical issues she bases her disability benefits claim upon are more recent, however. The neck and back pain she complains of reportedly began in 2004. (*Id.*) She began seeking treatment for her pain in 2007. Because Ocasio's medical treatment records are voluminous, the court summarizes the relevant history below.

#### 1. Taylor Rehabilitation and Wellness Centers

From February to March 2007, Ocasio sought treatment at Taylor Rehabilitation and Wellness Centers ("Taylor"), a chiropractic center. She presented at Taylor reporting neck and back pain symptoms and received ultrasound therapy for her pain. The medical records provided by Taylor do not indicate why Ocasio stopped receiving treatment at Taylor, although they do

---

[2] ALL CITES TO RECORD EVIDENCE (**R. ___.**) ARE TO THE CERTIFIED ADMINISTRATIVE RECORD.

indicate that her pain was intermittent, varied in severity, and that she received some treatment for the pain. (*See* R. 288-312.)

### 2. Advocate Health Centers

On January 14, 2009, Ocasio presented at Advocate Health Centers reporting neck and shoulder pain, as well as depression. (R. 518.) Her treating physician prescribed Sertraline, a selective serotonin reuptake inhibitor ("SSRI") commonly prescribed to treat depressive and anxiety disorders.[3] (*Id.*) At her January 26, 2009 appointment, Ocasio reported that her pain "prevented [her] from working." (R. 519.)

Around the same time, on January 22, 2009, Dr. Dudek at Weiss Memorial Hospital saw Ocasio for a "consultation." (R. 419.) In April 2009, Dr. Dudek recorded that "[Ocasio] is tender [illegible] most of the 28 fibromyalgia point[s]." (R. 421.)[4] According to the government, Dr. Dudek "wanted to rule out fibromyalgia" and "started her on Cymbalta [duloxetine]," a drug that is prescribed to treat depression and generalized anxiety disorder, as well as pain from fibromyalgia.[5] (R. 24.) Dr. Dudek wrote in the same report that he believed Ocasio's "pain is out of proportion to her X-ray." (R. 422.)

### 3. Chicago Institute of Neurosurgery and Neuroresearch

In addition to seeking treatment with Advocate Health Centers, Ocasio also sought treatment at Chicago Institute of Neurosurgery and Neuroresearch ("CINN"). On January 29, 2009, she saw Dr. Stadlan, and reported constant pain over the prior two years, especially while working at a desk. (*Id.*) Ocasio also reported taking Vicodin several times a day, and also taking

---

[3] Information regarding the purpose of specific medications is from the National Institutes of Health. *Sertraline*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html.
[4] The court has indicated when it is unable to decipher handwritten notes by physicians by denoting those portions "[illegible]."
[5] *Duloxetine*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html.

tramadol, Flexeril, and ibuprofen.[6] (*Id.*) Upon examination, Dr. Stadlan noted an "unremarkable" neurologic examination. He opined that her pain seemed to be "musculoskeletal [rather] than anything discogenic." (*Id.*) He recommended physiatry and physical therapy to treat her pain. (*Id.*)

At the request of Dr. Stadlan, Ocasio also saw Dr. Villoch in the physiatry department at CINN. (R. 467.) Dr. Villoch noted that at the time of her examination, Ocasio was taking the following medications: cyclobenzaprine, tramadol, Vicodin, Ortho Evra, sertraline, Lidoderm, and ibuprofen.[7] She prescribed Ocasio Vicodin and instructed her to discontinue taking tramadol. (R. 469.) She also noted Ocasio was "quite tearful . . . in the examination room secondary to being frustrated with the situation." (R. 468.) After examining Ocasio, Dr. Villoch concluded, "there is a component of both cervical facet-mediated pain as well as possible left shoulder pathology." (R. 468.) She created a plan to administer cervical facet injections to Ocasio to treat the pain. (*Id.*) Dr. Villoch also ordered MRI testing. (*Id.*)

On February 27, 2009, an MRI revealed that Ocasio had "rotator cuff tendinopathy . . . without evidence of rotator cuff tear" and a small joint effusion. (R. 463.) Ocasio followed up with Dr. Villoch on March 11, 2009. (R. 482.) Ocasio reported that pain in her shoulder and neck had begun to be aggravated by overhead activities, such as washing her hair. (*Id.*) She also reported that physical therapy aggravated her symptoms. (*Id.*) At this appointment, Dr. Villoch administered a steroid (facet) injection to Ocasio's left shoulder.

On April 24, 2009, Ocasio underwent a behavioral medicine consultation at CINN. (R. 434.) Dr. Kostas, the psychologist who evaluated her, noted that Ocasio reported that her

---

[6] Vicodin and tramadol are used to treat moderate to severe pain; Flexeril is a muscle relaxant. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/.
[7] Cyclobenzaprine is a muscle relaxant; Ortho Evra is a form of birth control; Lidoderm (generically lidocaine) is a local anesthetic for pain relief. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/.

internist, Dr. Lee, had diagnosed Ocasio with fibromyalgia and prescribed Cymbalta, which

Ocasio could not tolerate. (*Id*.) As a result Ocasio reported that she had switched back to Zoloft.[8]

(*Id*.) Dr. Kostas evaluated Ocasio in part using the Beck Depression Inventory, on which she

scored a 30, indicating moderate to severe depression.[9] (*Id*.) On the Hospital Anxiety and

Depression Scale, she scored 16 on anxiety (severe), and 11 on depression (moderate). (*Id*.)

According to Dr. Kostas, these scores were consistent with Ocasio's subjective experience of

emotional distress. (*Id*.) Dr. Kostas also observed:

> [T]he interview suggests that much of Mrs. Ocasio's current level of depression and
> anxiety stems not only from her pain and from the ways in which it has prevented her
> from living a full and productive life, but also from her interpretation of the pain
> when it increases in its severity.

(*Id*.)

Ocasio followed up with Dr. Villoch again on April 29, 2009, at which point Dr. Villoch

recommended increasing the dosages of Ocasio's Zoloft and Xanax. Consistent with Dr.

Kostas's findings, Dr. Villoch's treatment notes indicate that Dr. Villoch believed "there is a

significant, very strong component of depression and anxiety that is heightening the patient's

perception of her pain." (R. 480.)

### 4. Dr. Stanley Tomczyk

On August 26, 2009, Ocasio met with another treating physician, Stanley Tomczyk. (R.

580.) In his report, Dr. Tomczyk noted that Ocasio was following up for her pain, and that she

---

[8] Zoloft is a non-generic version of sertraline. *See*
http://www.nlm.nih.gov/medlineplus/druginfo/meds/.

[9] The Beck Depression Inventory is a "21-item, self-report rating inventory that measures
characteristic attitudes and symptoms of depression." AMERICAN PSYCHOLOGICAL ASSOCIATION,
http://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/beck-
depression.aspx.

had seen multiple physicians before presenting at his practice. (*Id.*) Dr. Tomczyk recorded that Ocasio was on several medications: ibuprofen, alprazolam, Zoloft, diazepam, vicodin, and a lidocaine patch.[10] (*Id.*)

Dr. Tomczyk's final assessment of Ocasio consisted of the following:

> (1) Cervical Syndrome/Possible Fibromyalgia. The patient was given [Neurontin] 300 mg. May consider TENS and acupuncture versus also injection on next visit. (2) Anxiety and depression. The patient was given Pristiq . . . . (3) The patient is on multiple medications. We discussed addiction problems considering benzodiazepines and Vicodin.

(R. 581.)[11]

Ocasio followed up with Dr. Tomczyk on September 16, 2009. Ocasio reported improvement as a result of her Seroquel prescription. (R. 621.) Dr. Tomczyk's assessment stated that Ocasio reported that some of her pain had improved since her last visit with him, but that "[Ocasio] does have some tender points and muscle spasms along [her] side." (*Id.*) He applied TENS to treat her pain. His assessment also noted Ocasio's anxiety and Dr. Tomczyk's recommendation that she follow up with a psychiatrist.

In a letter dated January 27, 2010, that was sent to Ocasio's retained law firm, Dr. Tomczyk wrote that Ocasio had diagnoses of "cervical syndrome, fibromyalgia and a rotator cuff tear. Because of these conditions she has difficulty sitting for a prolonged period of time and limited range of movement of her neck." (R. 637.)

### 5. Dr. Joanna Poniatowicz

On December 7, 2009, Ocasio saw Dr. Poniatowicz, a psychiatrist. (R. 735.) Ocasio reported anxiety, depression, and continued neck pain to Dr. Poniatowicz. (Pl.'s Memo. at 4,

---

[10] Alprazolam is used to treat anxiety disorders and panic disorders; diazepam may be used to treat anxiety, muscle spasms, and irritable bowel syndrome. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/.

[11] Neurontin is prescribed for pain relief; Pristiq is used to treat depression. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/.

ECF No. 19.)[12] According to plaintiff, Dr. Poniatowicz diagnosed depressive disorder. (*Id.*) Over the course of the next several months, as Ocasio reported increased anxiety and panic attacks as well as continued pain, Dr. Poniatowicz diagnosed Ocasio with generalized anxiety disorder and fibromyalgia. (*Id.*) Dr. Poniatowicz also prescribed Ocasio additional medications, including Effexor, Xanax, Valium, Klonopin, Savella, and Topamax.[13] (*Id.*)

On May 1, 2010, Dr. Poniatowicz completed a psychiatric/psychological impairment questionnaire at the request of Ocasio's attorneys. (R. 737.) Dr. Poniatowicz reported that she diagnosed Ocasio with major depressive disorder and anxiety. The parties dispute whether Dr. Poniatowicz rated Ocasio's GAF (Global Assessment of Functioning) at a 40 or 90, and the treatment notes are illegible. (Pl.'s Memo. at 5, ECF No. 19.) Plaintiff asserts that Ocasio's primary symptoms, according to Dr. Poniatowicz, were depressed mood, crying spells, and anhedonia. (*Id.*) She also stated that Ocasio had marked limitations due to: personality change; mood disturbance; emotional lability; anhedonia (pervasive loss of interests); feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolation; blunt, flat, or inappropriate affect; and decreased energy. (R. 739.)

### 6. North Shore University Health System ("North Shore")

Ocasio began seeking care at North Shore on March 4, 2010, for pain management. (R. 749.) According to plaintiff, the examination "noted decreased range of motion in the neck, tenderness in the left upper quadrant of the back, and decreased motion in the shoulder." (Pl.'s

---

[12] The treatment notes in the record are illegible, so the court relies upon the parties' characterization as to what the treatment notes say for this portion of the facts. Any disagreement between the parties will be noted.

[13] Effexor is used to treat depression; Klonopin is used to relieve panic attacks; Savella is used to treat fibromyalgia; Topamax is a form of anti-convulsant. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/.

Memo. at 6, ECF No. 19.) On May 6, 2010, doctors at North Shore prescribed Voltaren, Opana ER, and Tapentadol to Ocasio.[14] (*Id.*)

### 7. Dr. Myers

Ocasio saw Dr. Myers, a rheumatologist. In a letter dated February 18, 2010, Dr. Myers discussed Ocasio's reports that Ocasio had experienced neck pain for the past three to five years and failed to respond to multiple therapies, including physical therapy, chiropractic treatment and massage. (R. 654.) Dr. Myers recommended facet injections to help with Ocasio's pain. She also discussed Dr. Lee's diagnosis of fibromyalgia and noted that Ocasio had a "poor sleep cycle due to her chronic pain and multiple tender points." (*Id.*) Dr. Myers also pointed out to Ocasio that she was "on . . . the right type of medications for fibromyalgia." Dr. Myers examined Ocasio and diagnosed her with (1) neck pain with history of cervical stenosis, (2) fibromyalgia, (3) rotator cuff tendinopathy. (R. 653-654.) She also noted Ocasio's diagnosis of and treatment for chronic depression and anxiety. (*Id.*)

### 8. Dr. Kale

On October 27, 2010, Dr. Kale, a rheumatologist, completed a fibromyalgia impairment questionnaire with respect to Ocasio. (R. 785.) He identified his clinical findings as generalized body pain – tenderness, "fibro fog," and non-restorative sleep. (*Id.*) Dr. Kale listed Ocasio's primary symptoms as: constant pain, fatigue, dizziness, and decreased cognitive skills. (R. 786.)

## B. Hearing Testimony

In addition to review of the extensive medical record, the ALJ heard testimony from Ocasio, a medical expert, and a vocational expert. The relevant portions are described below.

### 1. Ocasio's Testimony

---

[14] Voltaren, Opana ER, Tapentadol are prescribed for pain relief. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/.

Ocasio testified at a hearing before the ALJ on October 1, 2010. She was born in Chicago, Illinois, and attended high school until 1989 but did not graduate. (R. 73.) She had to drop out because of injuries from a motor vehicle accident, although she subsequently obtained her GED. (*Id*.)

Ocasio most recently worked at Banco Popular. (R. 69.) She stopped working in January 2009. At Banco Popular she processed loan data by inputting it into Banco Popular's data system. When the ALJ asked why she left her position at Banco Popular, she stated:

> Because I'm currently . . . because, due to my car accident [in 1989] that I was in, it left me in basically, after all these years, I came across a lot of – enduring a lot of pain, discomfort. I've had a lot of disabilities that I've had . . . over the years I did not know I had. I just was having chronic pains, things of that nature, and I followed through with several doctors . . . I found out there was a lot of different things wrong with me, which were a lot of neurological problems with my cervical spine and found out I had depression, anxiety, and basically, that's what was going on with me.

(R. 73-74.)

She elaborated that when she looked down at documents at work she was "always feeling pain . . . in [her] neck and was feeling stressed and . . . lightheaded, dizzy . . . ." (R. 79.) In addition to recounting her medical diagnoses and treatment history, Ocasio told the ALJ that she has trouble walking, and is only capable of walking "maybe a block, block and a half" because she injured her right knee after falling. (R. 82.) She also testified that she "can't lift overhead" and that it's "very, very hard" for her to dress herself or button and unzip clothing. (R. 83.) She stated that her husband helps her dress when he is available to do so but that she only bathes every other day "because of [her] chronic pain and nobody's [always] there to help [her] get dressed." (R. 115.)

Ocasio also testified regarding her fibromyalgia diagnosis. She reported experiencing pain throughout her body, and being told she had fibromyalgia by Drs. Poniatowicz, Lee, and

Tomczyk. (R. 118.) She treats the fibromyalgia with Cymbalta (duloxetine) and Gabapentin (used to treat, among other things, neuropathic pain)[15], but reports that these medications have not substantially reduced her pain. (R. 119.)

Ocasio also discussed her psychological conditions at the hearing. The ALJ asked Ocasio why she was able to work and handle the pain at one point but not now. (R. 120.) Ocasio responded:

> Because I guess I was having episodes, meaning they were probably anxiety episodes at home and I didn't know what was wrong with me and I had told my husband I don't know what's wrong with me; I don't feel right; I don't feel good; there's definitely something wrong with me; I really need to see a doctor . . . [t]here was definitely something more wrong with me than just the fibromyalgia, just other than the neurological problems that I had going on in my cervical spine. It had already affected I guess my mood, my ability to just do anything. I didn't want to be around people. I had noticed that as well. I had stopped taking calls from people at home. My whole social life just — I noticed I didn't want to talk to anybody.

(R. 120.)

Prior to leaving her job at Banco Popular, Ocasio "started missing work a lot" because she was "not feeling right, feeling sick." (R. 121.) As a result, she used all of her yearly vacation time before the end of January. (*Id.*)

### 2. Medical Expert Testimony

Dr. Newman, the ME in this case, gave his testimony on the basis of listening to Ocasio's testimony at the hearing and reading her medical records. (R. 84.) He did not examine Ocasio, and was not her treating physician. Dr. Newman told the ALJ that Ocasio has several medically determinable impairments: (1) a "disk protrusion . . . which would account for the left-sided neck pain and pain down her left arm, (2) "tendinopathy of the [rotator] cuff," and (3) tendinosis

---

[15] *Gabapentin for Chronic Neuropathic Pain and Fibromyalgia in Adults*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0014677/.

in the left shoulder. (R. 89-90.) When asked whether any of Ocasio's conditions, alone or in combination, met a listing in medical severity, he testified that they did not. (R. 90.)

Dr. Newman next testified about Ocasio's residual functional capacity ("RFC"). He testified that "the objective physical findings are not incompatible with sedentary work" although she "shouldn't do any work with the left arm overhead" because of the tendinosis. (R. 91.) He also stated that he believed Ocasio could "do light work like . . . be on her feet six hours during an eight-hour work shift . . . as long as there wasn't a lot of – any significant squatting or crawling or a lot of stair climbing." (*Id.*) He also noted, however, that the problems Ocasio complained of about her knee limited his analysis and that he would not ask her to do "occasional stair climbing . . . I wouldn't ask her to do that without further studies." (R. 93.)

At a later point in the hearing, O'Linnger ("O'Linnger"), Ocasio's attorney, questioned Dr. Newman regarding his earlier testimony. (R. 124.) He started by asking Dr. Newman questions regarding fibromyalgia:

> ATTY: [J]ust first of all, you never mentioned the diagnosis of fibromyalgia. Is that you didn't see it, you don't believe it's an impairment, or what's the reason for that?
>
> NEWMAN: Well, I did see it. My field is orthopedics.
>
> ATTY: Okay. So it's just something that you didn't feel like – it was outside of your area of expertise so you didn't consider it?
>
> NEWMAN: Yes, it's not physical. I deal with the physical problems not mental problems.
>
> ATTY: Okay. Do you think it's – what do you mean it's not physical? Do you think it's psychological, the fibromyalgia?
>
> NEWMAN: Whatever it is, it's not physical.
> . . .
> ATTY: So any limitations from that impairment were not considered in your hypothetical or your RFC?
>
> NEWMAN: No. No.

(R. 124.)

Ocasio's attorney followed up his questions of the experts with a conversation with the ALJ. In particular, they discussed the issue of fibromyalgia. The ALJ acknowledged, "fibromyalgia is a recognized rheumatological disorder [and] that if you're able to show there are 11 trigger points of sensitivity out of 18, by law, the diagnosis may assume a medically determinable impairment." (R. 132.) The ALJ went on to say:

> Dr. Tomczyk on page three says the patient does have tender points, multiple, over the cervical and paracervical areas around the scapula. Yes, that's good enough. I don't – *fibromyalgia is there*. Significance is another matter . . . *we'll accept that it's a medically determinable impairment*.

(R. 133; emphasis added.)

In light of this admission, when Ocasio's attorney pointed out to the ALJ that Dr. Newman did not testify about fibromyalgia, and that Dr. Newman was never asked about fibromyalgia, O'Linnger and the ALJ discussed the medical expert's views:

> ALJ: Dr. Newman doesn't touch mental. It's just he won't go there . . . just so we don't press him. He's a medical doctor but he does not . . . feel comfortable going there.
>
> ATTY: Well, you know that a lot of medical doctors will touch – will talk about fibromyalgia. I mean that's just his personal preference he's not going to do it.
>
> ALJ: Oh, internal medicine people will but Dr. Newman's orthopedic and he has – quite frankly, *he has his own views on fibromyalgia . . . he doesn't buy into it being, you know, a rheumatological or immune system disorder. He thinks it's strictly, you know, a mental health issue. I mean but that's his philosophy. That's his right. I mean . . . he disagrees with the current mainstream view of the disorder. I mean, as a matter of law, it is recognized as a medically determinable impairment*.

(R. 140-141; emphasis added.)

### 3. Vocational Expert Testimony

A vocational expert, James J. Radke ("Radke") also testified at Ocasio's hearing. He based his testimony on hearing Ocasio's testimony and reading the portions of the file related to Ocasio's work history. The ALJ presented a hypothetical profile to Radke for his consideration:

> [T]his person is 38 years of age with a high school education . . . and has a skilled work background. In terms of lifting, this person shouldn't be required to lift over ten pounds and would not be able to do any overhead work with the non-dominate [sic] left upper extremity and should not be placed in a job that had strict production results required within rigid time periods which also would mean that this individual should not have to work any job that had a fast pace workflow demanded. So the ultimate question is[:] are there any unskilled jobs in the United States that an individual like this is able to perform?

(R. 98-99.) After some clarification about what kind of work was included in the category "semi-skilled," Radke testified that the person in the hypothetical "could do the loan assistant occupation." (R. 101.)

Ocasio's attorney followed up on the ALJ's examination of the VE. Upon examination by the attorney concerning an individual who is off-task or missing work, Radke opined that "someone that was going to be off task . . . up to 33% of the time" would not be able to perform past work or other work. (R. 129.) Radke also stated that even if a person "could perform a full range of any exertional level, if they were going to miss work two to three times per month for health-related reasons [they] could not sustain competitive employment." (R. 130.)

### 4. ALJ's Decision and Reasoning

The ALJ found that Ocasio had three severe impairments: (1) cervical spine degenerative disc disease, (2) left rotator cuff tendinitis, and (3) mood disorder. (R. 22.) The ALJ undertook the SSA's five-step evaluation process for determining whether an individual is disabled. (R. 20-21.)

The regulations outline the five-step evaluation process as follows:

**Step One**: The SSA considers claimant's work activity, if any. If claimant is engaged in substantial work activity, the SSA finds that claimant is not disabled.

**Step Two**: The SSA considers the medical severity of claimant's impairment(s). If claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirements in 20 C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement, the SSA finds that claimant is not disabled.

**Step Three**: The SSA again considers the medical severity of claimant's impairments. If the claimant's impairment meets or equals a listing in the regulations and meets the duration requirement, the SSA finds the claimant disabled.

**Step Four**: The SSA considers its assessment of claimant's residual functional capacity and claimant's past relevant work. If claimant can still perform past relevant work, the SSA will find that claimant is not disabled.

**Step Five**: The SSA considers its assessment of claimant's residual functional capacity, age, education, and work experience to see if claimant can make an adjustment to other work. If claimant can make an adjustment to other work, the SSA will find that claimant is not disabled. If claimant cannot make an adjustment to other work, the SSA will find that claimant is disabled.

20 C.F.R. § 404.1520(a)(4)(i)-(v).

At Step One, the ALJ found that Ocasio had not engaged in substantial gainful work activity since January 22, 2009. (R. 22.) As a result, the ALJ proceeded to Step Two. (*Id*.)

At Step Two, the ALJ determined that Ocasio has three severe medically determinable impairments: cervical spine degenerative disc disease, left rotator cuff tendinitis and mood disorder. (*Id*.) He based these findings on a review of the medical record. With respect to the cervical spine degenerative disc disease, the ALJ pointed to MRIs performed during Ocasio's treatment at Advocate Health Centers. (R. 23.) Specifically, the ALJ cited the findings of Dr. Yang, who opined that Ocasio had signs of degenerative disc disease. (*Id*.) The ALJ noted that Ocasio responded positively to physical therapy. (*Id*.) The ALJ also observed that Ocasio reported improvement in mood after beginning an anti-depressant. (*Id*.) However, after Ocasio

stopped receiving prescriptions for pain medications, she reported a return of symptoms and was referred to a spine specialist at CINN. (*Id*.)

In February 2009, an MRI performed at the request of doctors at CINN revealed left shoulder rotator cuff tendinopathy. (*Id*.) While at CINN, Ocasio told one of her doctors that she had recently been diagnosed with fibromyalgia. (R. 24.) Dr. Kostas, a physician at CINN, reported that Ocasio "appeared to be experiencing an inordinate amount of emotional distress (depression and anxiety) . . . ." (*Id*.) In mid-2009, other doctors noted Ocasio's increased anxiety symptoms and recommended psychiatric treatment for Ocasio's depression and anxiety before attempting to treat Ocasio's physical pain. (*Id*.)

The ALJ also noted that Ocasio sought treatment at Weiss Memorial with Dr. Dudek. (*Id*.) According to the ALJ, Dr. Dudek's notes indicate that "[Ocasio] was tender over most of the 28 fibromyalgia points and [Dr. Dudek] wanted to rule out fibromyalgia." (*Id*.) Ocasio also sought treatment with Dr. Tomczyk for her "multiple pain complaints." (*Id*.) Dr. Tomczyk's "initial assessment was cervical syndrome and 'possible' fibromyalgia." (R. 25.) Ocasio also saw an orthopedic specialist, Dr. Myers, who reportedly "observed that claimant appeared fixated on getting Vicodin refill but advised her that given her diagnosis of fibromyalgia she was on the appropriate medication (Neurotonin) for this." (*Id*.)

In addition, the ALJ discussed psychiatric treatment notes from Dr. Poniatowicz, from whom Ocasio sought treatment from December 7, 2009 through April 8, 2010. (R. 26.) According to the ALJ's characterization, the notes "fail to document any clinical findings but reflect multiple medication adjustments over [a] period of time." (*Id*.) The ALJ noted that Dr. Poniatowicz "stated [Ocasio] had responded well to Savella, a known treatment for fibromyalgia, after failure of multiple medication trials." (*Id*.)

At Step Three, the ALJ determined that "[Ocasio] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" in the relevant regulation. (*Id*.) To reach this conclusion, the ALJ relied upon the opinion of Dr. Newman, the medical expert who testified at the hearing. The ALJ stated that "the medical expert testified that the claimant's impairments do not meet or equal any listing" and that "the [ALJ] deems the medical expert's testimony reliable." (*Id*.) The ALJ also found that Ocasio's mental impairments did not meet listing requirements necessary to be considered disabled. (R. 27.) He found that "[Ocasio's] mental impairment results in no restrictions in activities of daily living and no limitations in social function. (*Id*.) He did find that Ocasio had "moderate difficulties" with respect to concentration, persistence, or pace; however she did not have the "marked difficulties" required to qualify for disability. (*Id*.)

At Step Four, the ALJ found that Ocasio has "the residual functional capacity to a reduced range of light work . . . except the claimant is unable to lift/carry/push/pull more than 10 pounds maximum; unable to perform overhead work with the left (nondominant) upper extremity; and unable to sit, stand and/or walk for more than 6 hours each activity in an 8-hour day. Additionally, the claimant is limited to work with no time sensitive product requirements necessitated by a fast workflow." (*Id*.) To reach this conclusion, the ALJ explained that he was required to make a finding on the credibility of Ocasio's statements because statements "about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by the objective medical evidence." (R. 28.)

The ALJ found that Ocasio's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible to the extent

they are inconsistent with the above [RFC] assessment." (*Id.*) Specifically, the ALJ found no medical evidence of Ocasio's reported chronic right knee pain or deficits in fine or gross motor manipulation (e.g. struggling to zip or button clothes). He also opined that although Ocasio reported increased neck pain, her treating sources did not order additional diagnostic testing, which "one would expect, if her doctors believed her condition was deteriorating." (*Id.*)

The ALJ also rejected opinion evidence in the record. He found Dr. Poniatowicz's opinion "not . . . persuasive" and gave it "little, if any, weight because there are no reasons for the draconian limitations articulated" and because "no significant problems with either activities of daily living or social functioning can be found elsewhere in the record." (*Id.*) The ALJ also rejected the fibromyalgia questionnaire completed by Dr. Kale, giving it no weight because it is not supported by clinical findings and "appears to be based solely on the claimant's reported symptomatology." (*Id.*)

On the other hand, the ALJ gave great weight to Dr. Newman, the medical expert, whom the ALJ stated "has a great understanding of our disability program and eligibility requirements and had the opportunity to review the entire medical file and listen to the claimant's testimony before rendering his opinion."

Because the ALJ found that Ocasio could still perform past work as a loan assistant, he did not proceed to the Step Five analysis. (R. 29.)

## I. STANDARD OF REVIEW

A claimant is entitled to disability benefits if she can prove she is "under a disability," meaning she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). The impairment must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques;" without medical evidence, the ALJ will not consider an individual to have a disability. *Id*. at §§ 423(d)(3), (5).

The Social Security Act permits claimants, after they have exhausted administrative remedies, to file suit in federal district court alleging that the factual determinations made by the ALJ who decided the case are not supported by "substantial evidence." 42 U.S.C. § 405(g). The district court must review the administrative record to determine whether there was a reasonable factual basis for the denial of benefits. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The court cannot decide facts anew, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Id*. Although the ALJ is not required to mention every piece of evidence, the ALJ must provide an "accurate and logical bridge" between the evidence and the conclusion that the claimant is not disabled, so that the court "may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review." *Id*. at 1002.

## II. ANALYSIS

The court finds that the ALJ failed to properly weigh the medical opinions of all treating doctors in reaching his decision to deny benefits. Additionally, although the ALJ adequately considered the credibility of Ocasio's testimony with respect to her alleged physical impairments, he did not do so with respect to her alleged psychological impairments. Finally, the ALJ based his opinion on flawed testimony from the vocational expert, James Radke.

### A. Opinions of Examining Doctors and Medical Expert

Ocasio argues that the ALJ did not accord proper weight to the opinions of Drs. Poniatowicz or Kale in making his determination. An ALJ must evaluate every medical opinion

in the record using the factors in 20 C.F.R. § 404.1527(c).[16] Further, the ALJ must clearly state the weight he or she gives to medical sources and the reasons that support that decision. *See Ridinger v. Astrue*, 599 F.Supp.2d 995, 1006 (N.D. Ill. 2008). An ALJ must give "controlling weight" to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(b)(2). An ALJ may, however, give less weight to the conclusions of medical sources to the extent they are inconsistent with other evidence. *Id*. at § 404.1527(c)(4). If an ALJ does so, he must "provide a sound explanation for rejecting" the medical source's opinion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). An ALJ may not ignore conflicting evidence in the record. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("[w]eighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do.").

### 1. Dr. Poniatowicz

Ocasio first argues that the ALJ should have given controlling weight to the opinions of Dr. Poniatowicz, her psychiatrist. In the alternative, Ocasio argues that even if the ALJ was not required to do so, he failed to weigh Dr. Poniatowicz's findings using the factors in 20 C.F.R. § 404.1527(c). Ocasio contends that the failure to weigh Dr. Poniatowicz's findings was not harmless. Ocasio emphasizes that Dr. Poniatowicz, a treating physician, indicated that Ocasio demonstrated marked limitations due to: personality change; mood disturbance; emotional lability; anhedonia or pervasive loss of interests; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolation; blunt, flat, or inappropriate affect; and decreased energy. (R. 739.) The government argues that the ALJ properly accorded "little, if any, weight" to Dr. Poniatowicz's opinion because the ALJ explained that his decision as to

---

[16] These factors are (1) the examining relationship, (2) the treatment relationship, (3) supportability of opinion, (4) consistency of opinion with the record as a whole, (5) specialization of doctor offering opinion, and (6) other factors.

weight derived from the fact that "Dr. Poniatowicz's own treatment notes failed to document any clinical findings" and because no "significant problems with either activities of daily or social functioning can be found elsewhere in the record." (Def.'s Memo. and Response at 5, ECF No. 24.)

The ALJ stated that he gave "little, if any, weight" to the opinions from Dr. Poniatowicz because "there are no reasons for the draconian limitations articulated nor can any significant problems with either activities of daily living or social functioning be found elsewhere in the record." (R. 28.) The court finds error in the ALJ's treatment of Dr. Poniatowicz's opinions.

The ALJ's reasoning was based upon the premise that the rest of the record did not reflect any significant problems with daily living or social functioning. This premise is belied by a thorough examination of the record. References to Ocasio's psychological impairments are present throughout the record. Beginning in January 2009, Ocasio reported depression to her doctors at Advocate Health Centers, and she received a prescription for an antidepressant. (R. 518.) When Ocasio sought treatment at CINN, her psychological symptoms were sufficient to warrant a behavioral medicine consultation with Dr. Kostas in April 2009. Dr. Kostas evaluated Ocasio using two separate assessments: the Beck Depression Inventory and the Hospital Anxiety and Depression Scale. (R. 434.) Ocasio's scores on these tests indicated moderate to severe depression (Beck Depression Inventory score), severe anxiety (Hospital Anxiety and Depression Scale score), and moderate depression (Hospital score). (*Id*.) Other treatment notes from Ocasio's time at CINN are consistent with these findings. Dr. Villoch's notes state that she believed "there is a significant, very strong component of depression and anxiety that is heightening the patient's perception of her pain." (R. 480.) These observations caused Dr. Villoch to recommend increasing Ocasio's dosage of Zoloft and adding a low dose of Xanax to

Ocasio's treatment regimen.[17] (R. 436.) Dr. Tomczyk also noted Ocasio's struggles with depression and anxiety, and diagnosed Ocasio with "anxiety and depression." (R. 581.) In addition to this diagnosis, Dr. Tomczyk prescribed Pristiq and noted that Ocasio would see a psychiatrist in the near future. (*Id.*) In sum, the record indicates that other physicians observed Ocasio's emotional struggles, how they affected her daily life, and prescribed her medications to address her anxiety and depression symptoms.

Moreover, although the ALJ stated why he discredited Dr. Poniatowicz's opinion, he did not discuss any of the observations by Drs. Kostas, Villoch, and Tomczyk when concluding that Ocasio's mood disorders do not rise to the level of disability. (R. 28.) In short, there is no explanation for why observations from other physicians should not also be considered when evaluating Ocasio's psychological impairments. Given that the ALJ did not discuss all the evidence on the record about Ocasio's mood disorders when making his decision or presenting his questions to the medical and vocational experts, he also did not adequately consider whether these issues limited Ocasio's ability to return to work.

In September 2009, Ocasio underwent a psychiatric evaluation "for the Bureau of Disability Determination Services" based on information "sent to [the physician] by the Bureau of Disability Determination Services." (R. 575.)[18] Although the ALJ acknowledged that a September 2009 psychiatric evaluation indicated that Ocasio was struggling with "depression [described by the government as moderate], secondary to chronic pain" and "anxiety [described by the government as minimal]" he did not explain why he considered this opinion but ignored the opinions of Drs. Kostas, Villoch, and Tomczyk in explaining his determination. (R. 28.) In

---

[17] Xanax (alprazolam) is a benzodiazepine used to treat anxiety disorders and panic disorders. *Alprazolam*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html.

[18] In short, this appears to be a psychiatric evaluation undertaken at the request of the government.

particular, he did not explain why he did not credit Dr. Kostas's evaluation that Ocasio's depression was "moderate to severe" and that her anxiety was "severe." (R. 434.)

On remand, the ALJ should consider the extent to which Ocasio's alleged emotional impairments restrict her ability to function, and articulate whether this supports the conclusion that her restriction is mild, rather than moderate or marked. *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). In doing so, the ALJ should examine all evidence on the record concerning Ocasio's emotional impairments, and not focus solely on the subset of testimony he discredits.

### 2. Dr. Kale

Ocasio next argues that the ALJ erred in rejecting opinions from her examining rheumatologist (Dr. Kale) in favor of testimony from a non-examining source (medical expert Dr. Newman). Ocasio takes particular issue with Dr. Newman's classification of fibromyalgia as a "non-physical" problem. (R. 124.) This conflicts with Dr. Kale's "Fibromyalgia Impairment Questionnaire" listing the following as positive clinical findings: "neck, generalized body pain – tenderness, fibrofog, [illegible], non-restorative sleep." (R. 785.) Dr. Kale indicated that the laboratory and diagnostic tests that supported his conclusions consisted of Ocasio's history and a physical exam. (R. 786.)

The government argues that the ALJ did not err when he gave "no weight" to the fibromyalgia questionnaire completed by Dr. Kale for several reasons: (1) the questionnaire was completed after a one-time examination, (2) the questionnaire appears to be based on Ocasio's reported medical history, and (3) the questionnaire lacks any support in any treatment records or clinical findings and appears to be based solely on the claimant's reported symptomatology. (R. 28.)

As discussed above, an ALJ must evaluate every medical opinion using the factors enumerated in 20 C.F.R. § 404.1527(c). An ALJ may give less weight to the conclusions of medical sources to the extent they are inconsistent with other evidence. *Id*. at § 404.1527(c)(4). Additionally, an ALJ is not required to assign controlling weight to a nontreating physician's opinion, where a nontreating source is defined as a "physician . . . who has exaimed [the claimant] but does not have, or did not have, an ongoing treatment relationship with the claimant." *See White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005); 20 C.F.R. § 404.1502.

In assigning no weight to Dr. Kale's opinion, the ALJ appears to focus on the examining relationship and treatment relationship between Dr. Kale and Ocasio, the supportability of Dr. Kale's opinion, and the consistency of Dr. Kale's opinion with the record as a whole. *See* 20 C.F.R. § 404.1527(c). An ALJ "must determine the appropriate weight to afford a non-treating physician's opinion" by looking at several factors. *Maziarka v. Colvin*, 983 F.Supp.2d 991, 1006 (N.D. Ill. 2013) (citing *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009). These factors include: how well [the nontreating physician] supported and explained his opinion, whether his opinion is consistent with the record, whether the [nontreating physician] is a specialist in pain disorders, and any other factor of which the ALJ is aware. *Id*. (citation omitted). The court considers the ALJ's analysis.

The first reason the ALJ gave for rejecting Dr. Kale's opinion centers on the examining and treatment relationship between Dr. Kale and Ocasio. In his opinion, he notes that Dr. Kale's conclusions were based on a "one-time . . . post-hearing" evaluation. In other words, Dr. Kale was a nontreating source. The court finds no error in the ALJ's conclusion that Dr. Kale was a "nontreating source." The record indicates that Ocasio saw Dr. Kale on one occasion, and that Dr. Kale based his conclusions on the single appointment he had with Ocasio. (R. 785.) This fits

the definition of "nontreating" physician articulated in § 404.1502 of the regulations. Thus, the ALJ was not required to assign controlling weight to Dr. Kale's opinion.

The ALJ's second and third reasons for rejecting Dr. Kale's opinion dovetail. The ALJ essentially asserts that Dr. Kale's assessment was not based upon any physical examination or laboratory findings, but rather upon Ocasio's self-reported symptoms.

"Any medical opinions upon which an ALJ should rely need to be based on objective observations and not merely on a recitation of claimant's subjective complaints." *Rice v. Barnhart*, 384 F.3d 363 (7th Cir. 2004). Essentially, the ALJ refused to give weight to Dr. Kale's opinion because it appeared to reflect Ocasio's own perceptions rather than Dr. Kale's objective medical findings. The record supports the ALJ's conclusion. The portion of the record Ocasio relies upon – the fibromyalgia questionnaire – is not accompanied by any objective findings. (R. 785-787.) Dr. Kale states that his answers to the questionnaire were based on a "physical exam" on the questionnaire itself, but no notes from any prior or contemporaneous physical exam appear in the record. (*Id.*) For these reasons, the ALJ's decision to give no weight to Dr. Kale's opinion is supported by sound reasoning.

### 3. Fibromyalgia Diagnosis

The fibromyalgia issue does not begin and end with Dr. Kale's assessment. Ocasio's argument is not simply that the ALJ did not properly weigh Dr. Kale's opinion, but rather that "the ALJ failed to properly weigh the medical opinions." Significantly, Dr. Kale is not the only physician who spoke to Ocasio's alleged fibromyalgia. Nevertheless, the ALJ does not explain in his opinion why he did not include fibromyalgia as a listed impairment. The paucity of reasoning is problematic for two reasons. First, fibromyalgia is a medically determinable impairment under Social Security Administration regulations.[19] Second, the ALJ was aware, at the time of the

_____

[19] Titles II and XVI: Evaluation of Fibromyalgia, 77 Fed. Reg. 43,641 (July 25, 2012).

hearing, that fibromyalgia was a medically determinable impairment and even conceded that it appeared to exist on the basis of the record before him. Despite this concession during the hearing, and his notations in his written opinion about Drs. Dudek and Tomcyzk's observations that Ocasio exhibited fibromyalgia symptoms, the ALJ did not explain why he failed to take this information into consideration in his analysis. The court finds that the ALJ's failure to address these issues was erroneous.

An ALJ must give "controlling weight" to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(b)(2). In Ocasio's case, physicians other than Dr. Kale diagnosed or made reference to Ocasio's fibromyalgia. At Advocate Health Centers, Dr. Dudek recorded that Ocasio was "tender over most of the 28 fibromyalgia points." (R. 421.) Dr. Dudek prescribed her Cymbalta, which is used to treat pain from fibromyalgia. (R. 24.) Treatment notes from CINN indicate that Ocasio's internist, Dr. Lee, diagnosed Ocasio with fibromyalgia. (R. 434.) Additionally, Dr. Tomczyk diagnosed Ocasio with "possible fibromyalgia." (R. 581.) These examples demonstrate that fibromyalgia was a condition that, at the very least, should have been addressed by the ALJ. Although the ALJ does discuss some of these findings in his opinion, he does not state why he does not find fibromyalgia to be a medically determinable impairment.

The paucity of explicit reasoning about the ALJ's decision regarding fibromyalgia is particularly disturbing in light of the hearing record. At the hearing, it is clear that he recognizes fibromyalgia as a medically determinable impairment but fails to acknowledge in his opinion. First, during a discussion on the record, the ALJ stated that fibromyalgia was present in this case when he told Ocasio's attorney:

Dr. Tomczyk on page three says the patient does have tender points, multiple, over the cervical and paracervical areas around the scapula. Yes, that's good enough. I don't – *fibromyalgia is there*. Significance is another matter . . . *we'll accept that it's a medically determinable impairment*.

(R. 133; emphasis added.)

In light of this statement, when Ocasio's attorney asked the ALJ why Dr. Newman (the medical expert) did not consider fibromyalgia, the following exchange took place:

ATTY: Well, you know that a lot of medical doctors will touch – will talk about fibromyalgia. I mean that's just [Dr. Newman's] personal preference [that] he's not going to do it.

ALJ: Oh, internal medicine people will but Dr. Newman's orthopedic and he has – quite frankly, he has his own views on fibromyalgia.

ATTY: I'm sure.

ALJ: You know, he's not – he doesn't buy into it being, you know, a rheumatological or immune system disorder. He thinks it's strictly, you know, a mental health issue. I mean but that's his philosophy. That's his right. I mean –

ATTY: Sure.

ALJ: [I mean] – he disagrees with the current mainstream view of the disorder. I mean, as a matter of law, it is recognized as a medically determinable impairment.

(R. 140-141.)

These statements by the ALJ illuminate that he knew that the ME, Dr. Newman, did not believe fibromyalgia is a medically determinable impairment. The statements do not, however, explain why the ALJ did not question the medical expert about fibromyalgia, why he did not include fibromyalgia in the hypothetical presented to the vocational expert, or, in the alternative, why he rejected the findings of doctors other than Dr. Kale who reported that Ocasio had fibromyalgia. On remand, the ALJ should explain the extent to which other doctors' opinions that Ocasio has fibromyalgia should be considered in his decision and what weight, if any, those

opinions merit. *See* 20 C.F.R. § 404.1527(c) (stating that an ALJ must evaluate every medical opinion in the record); *Ridinger v. Astrue*, 599 F.Supp.2d 995, 1006 (N.D. Ill. 2008).

## A. Claimant's Credibility

Ocasio next argues that the ALJ "applied the wrong legal standard" in assessing the credibility of her subjective complaints and alleged limitations. Ocasio argues that the ALJ used unacceptable boilerplate language to explain his determination that he did not find her testimony regarding her limitations to be credible. The court finds that the ALJ adequately explained his reasons for rejecting Ocasio's testimony about her physical complaints. However, the court also finds that the ALJ did not adequately explain his reasons for discrediting Ocasio with respect to her psychological impairments.

ALJ "credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses." *Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014) (citing *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012)). A court will overturn a credibility determination only if it is "patently wrong" which "means it lacks any explanation or support." *Murphy* at 816. However, "[a]n ALJ may not 'discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence.'" *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004)). An "ALJ should look to a number of factors to determine credibility.[20] *Id*; *see also* 20 C.F.R. § 404.1529(c)(3).

Additionally, the Seventh Circuit has "often criticized the inclusion of . . . boilerplate language as 'meaningless.'" *Murphy* at 816. "However, no matter how unhelpful the language is, simply because the ALJ used boilerplate language does not automatically undermine or discredit

---

[20] These factors include: "objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, treatment received and medication taken, and "functional limitations." 20 C.F.R. § 404.1529(c)(3).

the ALJ's ultimate conclusion" if he justifies his credibility determination with other

information. *Id*. Thus, the ALJ's use of boilerplate language is reversible error if [he] did not

give sufficient reasons, grounded in evidence in the record, to support [his] credibility

determination." *Id*.

Ocasio characterizes the following paragraph from the ALJ's opinion as "boilerplate"

and argues that it indicates that the ALJ did not adequately consider her credibility:

> After careful consideration of the evidence, I find that the claimant's medically
> determinable impairments could reasonably be expected to cause the alleged
> symptoms; however, the claimant's statements concerning the intensity, persistence,
> and limiting effects of these symptoms are not credible to the extent that they are
> inconsistent with the above residual functional capacity assessment.

(R. 28.)

As a threshold matter, the court notes that the ALJ's language is precisely what the

Seventh Circuit characterizes as "boilerplate." *See Murphy*, 759 F.3d at 816. However, the fact

that it is boilerplate language does not automatically mean that the ALJ did not meet his burden.

*Id*. Here, the court finds that the ALJ gave sufficient reasons for his credibility determination

with respect to Ocasio's physical impairments, but not as to her psychological impairments.

### 1. Ocasio's Physical Impairments

The ALJ gave adequate reasons to support his conclusion that he found that Ocasio's

reported symptomatology was inconsistent with objective medical evidence.  The boilerplate

language is supported by more detailed reasons. For example, Ocasio testified that she has

difficulty dressing herself because she struggles to button or zip garments. (R. 83.) However, the

ALJ accurately states that no evidence, other than Ocasio's testimony, supports Ocasio's

assertion that she has had deficits in fine or gross motor manipulation. (R. 28.) He also noted that

"although [Ocasio] claims her neck pain symptoms have worsened in the last year, there is no

evidence her treating sources have ordered any additional diagnostic testing, which one would expect, if her doctors believed her condition was deteriorating." (*Id*.) These statements are sufficient to allow the court to conclude that the ALJ sufficiently explained his reasons for drawing the conclusion and did not merely rely on boilerplate. For these reasons, the court accepts the ALJ's credibility determination with respect to Ocasio's physical impairments. However, the court notes, as discussed earlier, that it was error for the ALJ not to consider Ocasio's alleged fibromyalgia diagnosis (from physicians other than Dr. Kale). The ALJ did not analyze Ocasio's credibility with respect to fibromyalgia. On remand, the ALJ should articulate his assessment of Ocasio's credibility with respect to her fibromyalgia symptoms.

### 2. Ocasio's Psychological Impairments

In examining the record as a whole, the court finds that the ALJ did not properly assess Ocasio's credibility with respect to Ocasio's psychological impairments for two reasons. First, the record belies the ALJ's claim that Ocasio failed to seek follow-up treatment for her psychological impairments. Second, there is no indication that the ALJ made any attempt to clarify why Ocasio did not seek psychological treatment to a degree that would lend her complaints credibility.

In the paragraph of the ALJ's opinion that discusses credibility he makes no mention of her psychological impairments. (R. 28.) Defendant, however, argues that the ALJ gave sufficient reasons in his written opinion when he noted that "Ocasio repeatedly failed to follow the recommendations of treating physicians to seek mental health counseling." (Def.'s Memo. at 10, ECF No. 24) (citing R. 24).) Defendant goes on to argue that "it appeared that Ocasio exhibited drug-seeking behavior when it came to addressing her alleged mental health concerns." (*Id*. at 11) (citing R. 23-25).) However, the court finds both of these reasons are problematic.

First, there is evidence in the record that shows that Ocasio did eventually seek mental health treatment. The ALJ stated in his opinion:

> On August 3, 2009, the claimant returned to CINN for follow-up and medication refills . . . [c]urrent medications included Vicodin, Flexeril, Xanax, Zoloft, and Valium. Dr. Villoch noted that despite her insistence the claimant had not yet seen a psychiatrist. Zoloft and Xanax were continued but Dr. Villoch again insisted the claimant follow-up [sic] with a psychiatrist to manage these medications.

(R. 24.) First, it is misleading to state that Ocasio did not follow up with psychiatric treatment. The record shows that on December 7, 2009, Ocasio sought psychiatric treatment from Dr. Poniatowicz and obtained prescriptions for her anxiety and depression. (R. 735.) The ALJ did not explain why this does not constitute "following up."

Second, the ALJ did not attempt to clarify why Ocasio allegedly did not seek additional treatment for her psychological impairments. Before "a history of sporadic treatment or failure to follow a treatment plan can undermine a claimant's credibility," the ALJ must "first explore the claimant's reasons for lack of medical care before drawing a negative inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Here, the ALJ did not ask Ocasio why she failed to pursue treatment, so the record does not support his inference that it was because her symptoms did not exist or were not serious. *See Murphy*, 759 F.3d at 816. At the very least, the ALJ had an obligation to explore his perceived deficiencies in Ocasio's handling of her own treatment before drawing a negative inference. For these reasons, the court finds that the ALJ erred in assessing the credibility of Ocasio's testimony regarding her psychological impairments.

## A. Vocational Expert's Testimony

Ocasio last argues that the ALJ relied upon flawed testimony from the vocational expert, Radke. According to Ocasio, the ALJ's RFC finding, which formed the basis for the hypothetical

question he posted to Radke, is not supported by substantial evidence. The hypothetical posed to

Radke was as follows:

> [T]his person is 38 years of age with a high school education . . . and has a skilled
> work background. In terms of lifting, this person shouldn't be required to lift over ten
> pounds and would not be able to do any overhead work with the non-dominate [sic]
> left upper extremity and should not be placed in a job that had strict production
> results required within rigid time periods which also would mean that this individual
> should not have to work any job that had a fast pace workflow demanded. So the
> ultimate question is[:] are there any unskilled jobs in the United States that an
> individual like this is able to perform?

(R. 98-99.)

"When an ALJ poses a hypothetical question to a vocational expert, the question must

include all limitations supported by medical evidence in the record." *Stewart v. Astrue*, 561 F.3d

679, 684 (7th Cir. 2009) (citations omitted). Ocasio argues that this hypothetical did not contain

all relevant information regarding Ocasio's condition, so the ALJ should not have relied on

Radke's response to the hypothetical.

In support, Ocasio stresses Radke's testimony that "an individual who is off task up to

33% of the workday or who would miss work two to three times per month would be unable to

work." (Pl.'s Brief at 14.) Ocasio believes "these limitations are much more consistent with the

record as a whole, and should have been given deference." Specifically, she points to evidence

from Drs. Poniatowicz and Kale regarding the frequency of absences and limits on concentration

reflected in the record. Ocasio's reliance on her physicians' assessments of how frequently she is

capable of working is misplaced. To the extent physicians opine on whether a claimant is able to

work, their opinions carry no weight; this determination is reserved to/for the Commissioner. *See*

20 C.F.R. § 404.1527(d).

However, there is a different reason that the hypothetical as presented is flawed. As

discussed in previous sections, the ALJ did not adequately assess medical opinions beyond those

of Drs. Poniatowicz and Kale regarding Ocasio's alleged psychological impairments or fibromyalgia diagnosis. For these reasons, the ALJ's hypothetical presented to the vocational expert is incomplete, and the ALJ relied upon flawed vocational expert testimony. On remand, the ALJ should consider whether Ocasio's psychological impairments and alleged fibromyalgia, as diagnosed by physicians other than Drs. Poniatowicz and Kale, should be considered when presenting the hypothetical to the vocational expert.

## I. CONCLUSION

Ocasio has demonstrated that the ALJ committed error did not adequately consider the entire record when making his determination. He did not construct a "logical bridge" between the record and his conclusions, particularly with respect to Ocasio's psychological impairments and alleged fibromyalgia. Therefore, Ocasio's motion to remand the case to the SSA for further proceedings [18] is granted, and the government's motion for summary judgment [24] is denied.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: January 9, 2015